# In the United States Court of Federal Claims

No. 18-cv-1141L
(Filed: August 30, 2019)

| | |
|---|---|
| JACKSON-GREENLY FARM, INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Keywords: Motion to Dismiss; RCFC 12(b)(1); Statute of Limitations; 28 U.S.C. § 2501; Stabilization Doctrine; Takings Clause; Flooding. |

*Ethan A. Flint*, Flint Law Firm, LLC, Edwardsville, IL, for Plaintiffs. *Adam M. Riley*, Flint Law Firm, LLC, Edwardsville, IL, Of Counsel.

*Edward C. Thomas*, Natural Resources Section, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom was *Jean E. Williams*, Deputy Assistant Attorney General.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiffs in this Fifth Amendment takings case own land on or near Dogtooth Bend Peninsula in Alexander County, Illinois. They allege that the Army Corps of Engineers' practice of placing an increasing number and variety of "river training structures" in the Middle Mississippi River ("MMR") has caused water levels to rise, resulting in recurrent atypical flooding of their property. According to Plaintiffs, the subjection of their property to such flooding became a permanent taking after 2016, when the federal government declined to provide financing to repair the Len Small Levee ("the levee"), which had previously provided some flood protection to the Dogtooth Bend area.

The government has moved to dismiss Plaintiffs' amended complaint on the grounds that their claims fall outside of the Tucker Act's six-year statute of limitations, and that, in any event, the Plaintiffs have failed to state a claim upon which relief can be granted. For the reasons set forth below, the Court agrees with the government that Plaintiffs have failed to carry their burden of establishing by preponderant evidence that their claims did not accrue before August 3, 2012, six years before they filed this suit. Therefore, the government's motion to dismiss is **GRANTED** and this case will be **DISMISSED without prejudice** for lack of subject-matter jurisdiction.

## BACKGROUND[1]

### I.      Dogtooth Bend and the Len Small Levee

Each of the sixty-two plaintiffs in this action owns land that is located in Alexander County, Illinois, the southernmost county in the state. Am. Compl. ¶¶ 19–67, ECF No. 11. Alexander County is bordered by the Mississippi River to the west and the Ohio River to the east. As depicted in a map supplied by the government—and reproduced below as Figure 1— Plaintiffs' property is concentrated near a southwestern region of the county known as "Dogtooth Bend" Peninsula, which is surrounded on three sides by the Mississippi River. See Def.'s Mot. to Dismiss ("Def.'s Mot.") Ex. 9, at 140A–41A, ECF No. 19-9; id. Ex. 16, at 2, ECF No. 19-16 (Alexander County map with index showing locations of Plaintiffs' property). The primary land use in the area is agricultural. Id. Ex. 9, at 144A.

---

[1] The facts set forth below are based on the allegations in the amended complaint, as well as jurisdictional facts drawn from the evidence submitted by the parties.

**Figure 1**



The Len Small Levee is a non-federal levee located on the banks of the Mississippi River along the western edge of Dogtooth Bend Peninsula. Def.'s Mot. at 9 (citing id. Ex. 7, at 8, ECF No. 19-7). The first portion of the levee was built by the State of Illinois after a "catastrophic flood" impacted the region in 1927. Am. Compl. ¶¶ 146, 148; Def.'s Mot. Ex 8, Ex. I at 1, ECF No. 19-8. When built, the levee was only 2.38 miles long, running from approximately miles 31.5 to 34.5 of the river. Def.'s Mot. Ex. 8, Ex. I at 1.

3

In 1969, local interests expanded the levee by 5.3 miles upstream and 7.9 miles downstream, so that it spanned the length of the river from approximately mile 24 to mile 39. Id. The purpose of the 1969 expansion "was to provide a 'limited degree of flood protection and lessen the highly erosive action of the river sweeping across the area and possibly cutting a new channel.'" Id. at 2. Sometime after the flood of 1973 (described below), the Levee District expanded the levee further downstream to its maximum length, from approximately mile 20 to mile 39, as depicted below in Figure 2. See Def.'s Mot. Ex. 10, at 2, ECF No. 19-10.

**Figure 2**



The levee "was designed to deflect high velocity floodwaters of the Mississippi River away from agricultural land at the upstream part of the bend." Id. Ex. 11, at 5, ECF No. 19-11. It

4

does not, however, supply a "closed system of protection" (i.e., it does not "tie back" to high ground). Id. Ex. 8, Ex. I at 2, 7; id. Ex. J at 43.[2] For that reason, the downstream part of the peninsula is not protected by the levee and has been subject to frequent "backwater" flooding both before and after the levee's construction. Id. Ex. I at 1–2.

A March 1984 report prepared by the Corps described some of the vulnerabilities in the flood protection offered by the Len Small Levee. See generally id. Ex. K. It noted that "[d]uring high stages of the Mississippi River, flood waters can break through the [] levee and flow overbank between river miles 16 and 31, bypassing about 15 miles of normal channel." Id. at 59. In addition, according to the report, studies of U.S. Geological Survey maps and aerial photographs showed "past tendencies for the river to cross Dogtooth Bend at about river mile 28," within the area that the levee was supposed to protect. Id. The resulting flooding in Dogtooth Bend, the Corps observed, "cause[d] crop damages, erosion of the land, deposition of sand on the farmland, and damages to farmstead property, farm stock and rural roads." Id. The report predicted that absent improvements, periodic flooding, erosion, and deposition of sand would continue to occur in the levee area because of "lack of continuous levee protection" and the "inadequate height" of the existing levee. Id. at 68.

In a November 1992 memorandum, Gary R. Dyhouse, the Chief of the Corps Hydrologic Engineering Section, discussed the extent to which the levee provided protection against five- and ten-year floods. He noted that the levee "is actually categorized more as a training dike, th[a]n as a levee, since it parallels the Mississippi River from about Miles 39–22 and does not tie back to high ground." Id. Ex. J at 43. He observed that the levee's "main value is to prevent Mississippi overflows from crossing the peninsula, scouring some areas and depositing sediment over others." Id. Beyond that, he noted, "any overbank flows result in flooding some of the 23,000 acres shown as 'protected', since the river can flood around the end of the dike." Id. Further, because "much of the 23,000 acres are very low-lying (elevations of 320–325), frequent flooding occurs." Id.

Mr. Dyhouse compared five- and ten-year interval flood profiles to the ground elevations of the area behind the levee. Five-year recurrence interval floods, he observed, would result in elevations of 326–328 NGVD, which would mean that the entire area south of Horseshoe Lake would be inundated by such floods. Id.[3] And while 2000–3000 acres in the northwestern portion of the area would not be flooded, soil moisture levels and road flooding "would likely prevent significant agricultural usage." Id. A ten-year flood, Mr. Dyhouse observed, "would result in flood elevations of 330–331 in the area and would essentially flood the entire area behind the levee." Id. This evaluation, Mr. Dyhouse observed, was confirmed by an examination of the effects of flood events in the area in May 1983 and in 1990. Id. at 43–44.

---

[2] The Court cites to internal page numbering where possible; otherwise cited page numbers are taken from the ECF header affixed during the filing process.

[3] As shown by Figure 1, Horseshoe Lake lies to the south of the town of Olive Branch on Dogtooth Bend Peninsula. See also June 26, 2019 Hr'g Tr. ("Tr.") at 8, ECF No. 32.

## II.      History of Flooding in the Dogtooth Bend Area

"[T]he farmers and homeowners who settled in [the] early 1800s on the bottomlands of
. . . Dogtooth Bend peninsula have battled flooding from the Mississippi River for the last 200
years." Id. Ex. 9, at 140A. Indeed, according to the State of Illinois, Alexander County
experienced major floods nineteen times between 1844 and 2011. Id. Ex. 7, at 1. On a number of
these occasions, and again most recently in 2016, the river's floodwaters overtopped and/or
breached the levee, causing significant damage to land, structures, and roads in the Dogtooth
Bend area.

Thus, the original levee—which, as noted, extended only from approximately miles 31.5
to 34.5 on the river—sustained flood damage in 1929, 1931, and 1935. See id. Ex. 8, Ex. I at 1.
Local interests repaired that damage. Id. The levee was again "severely damaged by floods" in
1943, 1944, and 1947. Id. The "[d]amage from the 1943 flood was so severe that an essentially
total reconstruction of the levee was made." Id. On this occasion, the Corps of Engineers, St.
Louis District, performed the repairs. Id.

Floodwaters breached the levee again on a number of occasions after its significant
expansion in 1969. In 1973, for example, damage from floodwaters included "30 breaks and
severe crown and slope scour caused by overtopping, and wave wash erosion." Id. at 2.

After the 1973 event, the Corps conducted a cost–benefit analysis and approved federal
assistance to repair the damage to the levee pursuant to its authority under Public Law 84-99. Id.
at 4.[4] Assistance was approved because, among other reasons, the Corps determined that the
benefit-to-cost ratio of repairing the levee was 1.10 to 1. Id. The total estimated cost of the
repairs was $794,100, $774,300 of which would be provided by the federal government, with the
remainder borne by local interests. Id. at 3–4.

The levee area was flooded at least seven more times between 1981 and 1992. Id. Ex. J at
43. The May 1983 flood referenced in Mr. Dyhouse's evaluation of the levee (discussed above),
"inundated nearly all of the area." Id. at 43–44. The May 1990 event to which he referred
flooded most of the levee area south of Horseshoe Lake. Id.

During the spring and summer of 1993, "record flooding inundated much of the
Mississippi River Basin." Id. Ex. 11, at iii. On July 15, 1993, the levee broke between miles 34
and 35. Id. at 5–6. By August 8, "[a]ll the Dogtooth Island bend area south of the Miller City
Road was inundated." Id. at 9. Although the waters receded, the area was then "affected
substantially by three additional floods"—one in late September through early October, another

---

[4] Pub. L. 84-99 "allows the Corps to repair and/or rehabilitate any qualified flood control project
[] whether it is federally constructed or privately owned." Dep't of the Army, Rehabilitation
Assistance for Non-Federal Flood Control Projects at 3 (Oct. 2009), available at
https://www.spa.usace.army.mil/Portals/.../PL84-99-Rehab_Assist_NFFC_Projects.pdf; see also
33 CFR Subpart D. Rehabilitation Assistance for Flood Control Works Damaged by Flood or
Coastal Storm: The Corps Rehabilitation and Inspection Program.

in mid-November, and a third in April 1994. Id. The first two floods created a high volume of flow through the levee break, resulting again in inundation of most of the area south of Miller City Road. Id. The April 1994 flood destroyed about 1000 meters of newly reconstructed levee. Id. at 10.

During the peak of the 1993 flood, "as much as 28 percent of the Mississippi discharge flowed through the break." Id. at 1. "With velocities as great as 300 centimeters per second, the flow through the levee break was able to scour an area 2,200 meters long to a maximum depth of more than 20 meters." Id. Further, "[t]ransport of sediment from the main channel, through the break, resulted in net deposition of at least 8.2 cubic meters of sand." Id.

By letter of September 20, 1993, and in the wake of the July 1993 breach in the levee, the Len Small Levee District's three commissioners (two of whom—David Willis and James Taflinger—are plaintiffs in this action) requested that the Corps of Engineers' Mississippi River Commission provide assistance. Id. Ex. 8, Ex. L at 223–25. They noted that as a result of the July breach, hundreds of residents of southwestern Alexander County had been forced from their homes. Id. at 223. Further, "[a]pproximately 37,000 acres of prime farmland were flooded and the livelihood of dozens of farmers and their families was lost." Id. "Also affected by the floodwaters was a portion of Olive Branch, IL forcing several more families from their homes and closing businesses." Id. The commissioners "conservatively estimated" the damage at $15 million. Id.

The commissioners explained that, as the Mississippi again approached flood stage, "water continues to pour into the area and thousands of acres remain underwater." Id. They warned that it was "vital that the levee be restored to its original integrity." Id. Noting that the local area was in economic distress, as well as the complexity of the problem faced, the commissioners requested that the Mississippi River Commissioners "empower a task force to formulate a solution to this dilemma." Id. at 224.

Federal financial assistance was provided in the wake of the 1993–1994 flooding and the levee was again repaired. Decl. of David Willis ("Willis Decl."), Pls.' Resp. to Def.'s Mot. ("Pls.' Resp.") Ex. 2 ¶¶ 6, 8, ECF No. 22-2. Nonetheless, in 2008 and 2011, Alexander County was again affected by severe flooding events. Def.'s Mot. Ex. 7, at 1. The May 2011 flood caused significant damage to the levee, resulting in "breaches and craters in five places." Id. Ex. 9, at 142A. After the levee was breached, more than 200 structures—most of them residences—"were inundated with up to six feet of water," and road closures were widespread for several days. Id. Ex. 7, at 1; id. Ex. 15, at 3, ECF No. 19-15. This flood event caused over $13 million in damage. Id. Ex. 15, at 3.

In the aftermath of the 2011 flood, the Federal Emergency Management Agency ("FEMA") considered a proposal to provide $12 million to buy out and relocate residents of the town of Olive Branch who lived in the floodplain. Id. The proposal to take residents "up and off the floodplain" was based on the "repeated flood damages including extensive damage after levee breaches in the Len Small Levee System during the 1993, 2008 and 2011 floods." Id. Ex. 7, at 1; id. Ex. 14, at 5, ECF No. 19-14. The plan was modeled in part after the example of Valmeyer, Illinois, which relocated after the 1993 flood. Id. Ex. 14, at 5. As of October 18, 2011, approximately 90% of the property owners in the town had signed up to participate in the

buyout, including three of the plaintiffs in this case (Kenneth and Sherry Pecord, owners of the Horseshoe Bar and Grill, and John Wissinger). Id.; Def.'s Mot. at 20–21 & n.20 (citing Am. Compl. Ex. 1, at 1, ECF No. 11-1; Def.'s Mot. Ex. 7, at 5–7). The record before the Court does not show whether the relocation plan ever proceeded beyond the exploration and planning stages.

The federal government again provided assistance to the local community to repair the levee after the 2011 flood. Willis Decl. ¶¶ 7–8. In early 2016, however, the area experienced another major flooding event. Average rainfall for the last two months of 2015 had been the highest amount ever recorded in Illinois and Missouri. Def.'s Mot. Ex. 3, Ex. A at X-30. The high-water mark at the Cape Girardeau gauge reached 48.86 feet in January 2016, breaking the previous 1993 record. Id. Ex. 9, at 140A. On January 2, floodwaters caused a one-mile long breach in the Len Small Levee. Id. at 142A. The water that poured through the breach "scoured out a crater lake and deep gullies into adjacent agricultural lands." Id. It flowed onto Dogtooth Bend Peninsula, creating a new channel across the land and reentering the main river on the other side of the peninsula. Id. The floodwaters took a "shortcut," bypassing about fifteen miles of river (the bend surrounding the peninsula) and temporarily creating an island which isolated the rest of the Dogtooth Bend region. Id. The flooding also deposited millions of tons of sand on more than 1500 acres of farmland and buried approximately seven to eight miles of roadway in the area. Id. at 143A; see also Am. Compl. ¶¶ 159–60.

The community again requested federal assistance to repair the levee. This time, on July 21, 2016, the Corps denied the request. Willis Decl., Ex. A at 4. The Corps estimated that $16,596,000 would be needed to complete repairs to the levee. Id. It concluded that the benefit-to-cost ratio for the repair effort was 0.78 to 1.0. Id. Because the ratio was not a favorable one, the Corps found that the repair project did not meet the program's eligibility requirements. Id.; see 33 C.F.R. § 203.44(b) ("A flood control project is eligible for Rehabilitation Assistance provided that the project is in an Active status at the time of the flood event, the damage was caused by the flood event, the work can be economically justified, and the work is not otherwise prohibited by [these regulations].").

Plaintiffs allege that without federal assistance they and other local stakeholders cannot finance the repair of the levee. Am. Compl. ¶¶ 152, 162–64. Thus, by August 2016, seven months after the breach, the levee still had "a gaping hole." Def.'s Mot. Ex. 9, at 143A. "[T]here was little value in fixing the roads, in cleaning out the ditches, or moving the sand off fields; and planting crops was risky" because "[s]pring or summer floodwaters could again pour through the hole, drowning crops and covering roads, ditches, and fields with new sand and debris." Id.

Plaintiffs allege that because the levee has not been repaired, they experienced "multiple flooding events causing severe crop loss" in 2017 and 2018. Am. Compl. ¶ 167. They further allege that, as a result of the 2016 breach, "many Plaintiffs' highly productive farmland has been covered by several feet of sand, ruining any agricultural value." Id. ¶ 184. Further, due to the flooding some or many plaintiffs cannot access their property, have suffered severe erosion of their land, have lost their homes and other buildings, and face insolvency or bankruptcy. Id. ¶¶ 187–91.

### III.      Plaintiffs' Theory of Causation

"River training structures" are used by the Corps to reduce expenditures and minimize maintenance dredging by "re-directing the river's energy to achieve a desired velocity and/or scour pattern to deepen or provide better alignment for the navigation channel." Def.'s Mot. Ex. 1, at 5, ECF No. 19-1. Their purpose is to "constrict the river channel, concentrate flow, redirect sediment, and deepen and maintain the navigable portion of the channel." Am. Compl. ¶ 74.[5]

The Corps began building river training structures in the 1800s and there are currently nearly 1600 such structures in the MMR. Def.'s Mot. Ex. 5, Ex. C at 10. Ninety-one percent of the structures were in place by 2000. Def.'s Mot. at 18 (citing id.). Plaintiffs allege that the "portions of the River affecting Plaintiffs' property now include the greatest densities of dike structures, both in number and length, in the world." Am. Compl. ¶ 8. This has "chang[ed] the River's hydrograph," according to Plaintiffs, and increased the water surface elevation of the river. Id.

Plaintiffs do not attempt to pinpoint when the river structures in the MMR became sufficiently numerous or of a type that caused atypical flooding. Instead, they allege that the impact of river training structures on water levels is cumulative. Id. ¶ 130. They contend that the newer structures used by the Corps since the 1990s (in particular the bendway weir) "contribute even more substantially to rising water surface elevations and flooding than their predecessors." Pls.' Resp. at 4, ECF No. 22 (citing Am. Compl. ¶¶ 93–94). They also contend that the mean local stage of the river has been progressively increasing as a result of the Corps' addition of new structures over time. Id. at 5.

The theory that river training structures are responsible for the severity of the flooding on the MMR is not a new one. It has been the subject of public discussion and debate since at least the mid-1970s, beginning in the years after the 1973 flood, and gaining more attention through the first decades of the twenty-first century. See Michael A. Stevens et al., Man-Induced Changes of Middle Mississippi River, 101 J. Waterways, Harbors & Coastal Engineering Division 119–33 (1975); C.B. Belt Jr., The 1973 Flood and Man's Constriction of the

---

[5] The most common river training structure in the MMR is the wing dike, which extends perpendicularly from the river bank into the river and which the Corps has been constructing in the MMR since the nineteenth century. Am. Compl. ¶¶ 76–77. More recently, the Corps has placed chevrons (arch-shaped dikes), S-dikes, and W-dikes in the MMR. Def.'s Mot. Ex 1, at F-21; Am. Compl. ¶ 98 (photograph of several chevrons); Def.'s Mot. Ex. 5, at Exs. F & H, ECF No. 19-5 (photographs of W-dike and S-dike). These structures are placed in the middle of the river and function similarly to wing dikes to maintain the navigation channel. See Def.'s Mot. Ex. 1, at F-20 to F-21; Am. Compl. ¶ 98, Def.'s Mot. Ex. 5, at Exs. F & H. The final type of structure, the bendway weir, was introduced in the MMR in 1989. Def.'s Mot. Ex. 1, at F-20 to F-21. A bendway weir is "a low-level, fully submerged rock structure that is positioned from the outside bankline of a river bend and angled upstream toward the flow." Id. at F-20; id. Ex. 5, at Ex. I (drawing of a bendway weir).

Mississippi River, 189 Sci. 681–84 (1975); see also Am. Compl. ¶ 79; Def.'s Mot. Ex. 1, at A-8 (citing sources). The Corps itself has studied the effect of river training structures on water elevation levels since the 1930s, but has consistently concluded that the theory lacks a valid scientific basis. See generally id. Ex. 4, ECF No. 19-4.

The theory that the severity of the flooding in the Dogtooth Bend area has been caused by the proliferation of river training structures in the MMR has also received significant attention in the press. In March 2008, three professors from Southern Illinois University ("SIU") published an editorial in the St. Louis Post-Dispatch in which they "detailed what they consider to be a major threat to the St. Louis-Metro East Mississippi River corridor, which also includes communities farther down the river to Cairo[, Illinois]." Id. Ex. 23, at 2, ECF No. 19-23. That threat was "the construction of river structures," which they said "exacerbate[d] flooding" and "contributed to the unprecedented levels of the 1993 flood." Id. Another local news article published on August 28, 2011 quoted Dr. Nicholas Pinter, one of the SIU professors, who stated that "[t]he problem in particular for Southern Illinois is our stretch of the river is the most densely wing-diked of any river in the world, that I've been able to find" and that "flood levels have increased enormously . . . . At its worst spot, 17 feet higher for the same storm upstream than a flood would have been in the mid-19[th] century." Id. at 7. Dr. Pinter was also quoted in a June 2008 Time Magazine article, opining that recent floods in the MMR were caused by river training structures whose use had significantly increased water levels. Id. Ex. 21, at 2–4, ECF No. 19-21. The editorial board of "St. Louis Today" in an August 2010 column recommended that before the Corps built any more structures, an independent review should be conducted by the National Academy of Sciences in light of "[t]wo decades of peer-reviewed scientific research" which had shown that river structures "worsen flooding." Id. Ex. 24, at 3, ECF No. 19-24; see also id. Ex. 22, at 2–4, ECF No. 19-22 (2008 Salon article summarizing theories of SIU professors regarding link between river training structures and flooding in the MMR region).

In October of 2011, Dr. Pinter presented his concerns in testimony before the U.S. Senate Committee on Environment and Public Works. See generally id. Ex. 14. During his testimony, Dr. Pinter attributed the "record crests" of the river in 1993, 1995, 2008, and 2011 to the Corps' construction of river training structures, which he observed had "the unintended effect of raising flood levels up to 15 feet." Id. at 4.

A few months later, in December 2011, GAO issued a report entitled "Mississippi River: Actions Are Needed to Help Resolve Environmental and Flooding Concerns about the Use of River Training Structures." See generally GAO-12-41 (December 2011), available at https://www.gao.gov/assets/590/586782.pdf. In that report, GAO recommended that the Corps update its research and perform new environmental assessments concerning the relationship between the construction of river training structures and the severe flooding in the MMR. Id. at 48–49.

Most recently, in 2014, environmental groups brought a lawsuit challenging several Corps environmental assessments which had concluded that river training structures did not significantly impact water surface elevations in the MMR. See generally Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs, No. 14-590-DRH-DGW, 2014 WL 6685235 (S.D. Ill. Nov. 25, 2014). The plaintiffs voluntarily dismissed their suit after the district court denied their motion for a preliminary injunction that would have stopped the Corps from placing new river training

structures in the MMR while the litigation was pending. Def.'s Mot. at 8–9. Applying the deferential standard of review applicable to cases arising under the Administrative Procedure Act, the court held that "the Corps has continually and extensively analyzed the physical effects of river training structures and reasonably concluded that they do not impact flood levels." Nat'l Wildlife Fed'n, 2014 WL 6685235, at *12.

## IV. This Action

Plaintiffs filed the present lawsuit on August 3, 2018. Compl., ECF No. 1. On December 3, 2018, the government filed a motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). ECF No. 10. It argued, among other things, that Plaintiffs' claims were untimely under the applicable six-year statute of limitations. Id. at 1, 13–29. The government also asserted that, in the alternative, Plaintiffs failed to state a claim upon which relief could be granted. Id. at 1–2, 29–38.

In lieu of a response to the motion, and in accordance with RCFC 15(a)(1)(B), on December 26, 2018, Plaintiffs filed an amended complaint. ECF No. 11. Pertinent to the present motion, in the amended complaint Plaintiffs deleted previous references to the relationship between the river training structures and the floods that occurred in 1993 and 2011. In addition, whereas in the original complaint Plaintiffs alleged that they had been deprived of the use and enjoyment of their land "due to a taking by recurrent flooding from breaches in the Len Small levee and other atypical flooding events," in the amended complaint they stated that they had suffered "a taking by recurrent flooding after the 2016 breach in the Len Small Levee." Compare Compl. ¶¶ 27–52, with Am. Compl. ¶¶ 21–67.

Thus, in their amended complaint, Plaintiffs allege that were it not for the number and variety of river training structures that the Corps has placed in the MMR, floodwaters would not have breached the Len Small Levee in 2016. See, e.g., Am. Compl. ¶ 11. They also allege that their property is now unprotected because the federal government declined to provide federal financial assistance to repair the levee after the 2016 breach. Id. ¶ 12; see also Willis Decl. ¶¶ 10–13. Further, they claim that their "unprotected property is now inundated with floodwaters with greater frequency, for longer durations, and at unusual times of the year in a manner that deviates from historical flooding patterns." Am. Compl. ¶ 12.

The "atypical flooding," Plaintiffs claim, "is and has been a direct and foreseeable result of the Army Corps of Engineers' gradual construction of Structures in the Rivers." Id. ¶ 197. Plaintiffs further allege that "[t]he Corps, as professional engineers, knew or should have known that the cumulative result of the number and configuration of its river training Structures would be the breach of the Len Small Levee and the frequent and recurring overflow of the River onto Plaintiffs' private property." Id. ¶ 13.

Plaintiffs further assert in their amended complaint that the flooding they have experienced since 2016 has caused severe crop loss, and has disrupted and interfered with their "reasonable, investment-backed expectations for the intended and customary use of their land and other property." Id. ¶ 14. They allege that the Corps has therefore taken their property for a public use without just compensation, in violation of the Fifth Amendment's takings clause. See id. ¶¶ 15–17.

11

On March 1, 2019, the government filed a motion to dismiss the amended complaint. ECF No. 19. The government again asserted that Plaintiffs' claims are barred by the Tucker Act's six-year statute of limitations and that, in any event, they have failed to state a claim on which relief may be granted. See generally Def.'s Mot. Oral argument was held on the government's motion on June 26, 2019.

For the reasons set forth below, the Court concludes that Plaintiffs' claims accrued more than six years before they filed the present action. The government's motion to dismiss for lack of subject-matter jurisdiction is therefore **GRANTED**.

## DISCUSSION

### I.    Jurisdictional Principles

The Tucker Act, 28 U.S.C. § 1491(a)(1), confers jurisdiction on the Court of Federal Claims to hear suits for compensation under the Fifth Amendment's Takings Clause. See, e.g., Boling v. United States, 220 F.3d 1365, 1370 (Fed. Cir. 2000) (citing Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 11–12 (1990)). Such suits, however, must be "filed within six years after [the takings] claim first accrues." 28 U.S.C. § 2501. This six-year limitations period "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988).

 In determining whether subject-matter jurisdiction exists, the Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011); see also Estes Exp. Lines v. United States, 739 F.3d 689, 692 (Fed. Cir. 2014) (same). Plaintiffs, however, have the burden of establishing subject-matter jurisdiction by preponderant evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). Therefore, where—as here—the government challenges a plaintiff's allegations of jurisdiction in a motion to dismiss under RCFC 12(b)(1), only those factual allegations that the government does not controvert are accepted as true. Shoshone Indian Tribe of Wind River Reservation v. United States, 672 F.3d 1021, 1030 (Fed. Cir. 2012); see also Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (noting that when reviewing a motion to dismiss for lack of subject-matter jurisdiction, the court accepts only uncontroverted factual allegations as true) (citing Gibbs v. Buck, 307 U.S. 66, 72 (1939)). Where jurisdictional facts are controverted, the Court "may consider relevant evidence in order to resolve the factual dispute." Reynolds, 846 F.2d at 747; see also Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991) (finding that a court may "inquire into jurisdictional facts" in ruling on a motion to dismiss under RCFC 12(b)(1)).

A takings claim accrues when "all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." Hopland Band of Pomo Indians, 855 F.2d at 1577. Where a permanent taking is alleged, "the key date for accrual purposes is the date on which the plaintiff's land has been clearly and permanently taken." Boling, 220 F.3d at 1370 (citing Seldovia Native Assoc., Inc. v. United States, 144 F.3d 769, 774 (Fed. Cir. 1998)). In the flooding context, a permanent taking occurs when flooding "creates a 'permanent liability' because of 'intermittent but inevitably recurring overflow.'" Cary

v. United States, 552 F.3d 1373, 1381 (Fed. Cir. 2009) (quoting United States v. Cress, 243 U.S. 316, 328 (1916)). A claim for a permanent taking through intermittent but recurrent flooding therefore accrues when "it first bec[omes] clearly apparent by the passage of time that the intermittent flooding [is] of a permanent nature." Barnes v. United States, 538 F.2d 865, 873 (Ct. Cl. 1976).

## II.     Plaintiffs' Claims Accrued More Than Six Years Before They Filed This Suit

Plaintiffs allege that their property has been permanently taken through recurrent flooding that was the direct and foreseeable result of government action—i.e., the Corps' practice of placing an increasing number and variety of river training structures in the MMR. Plaintiffs allege that their cause of action for a permanent taking accrued in 2016, when, "as a result of increased [water surface elevations] caused by the Corps' Structures, the Len Small Levee breached and caus[ed] destruction in 2016 never before seen." Am. Compl. ¶ 182. They further allege that "the Corps structures have caused and will continue to cause inevitably recurring flood events of longer durations, which have significantly impaired the use of agriculture and recreational property since the 2016 Len Small breach and will continue to do so." Id. ¶ 183.

The government contends that Plaintiffs have failed to meet their burden of showing that their claims were filed within the Tucker Act's six-year statute of limitations. It argues that Plaintiffs knew or should have known before August 3, 2012 (six years before they filed suit) that: 1) the Corps had already built hundreds of river training structures in the Mississippi River; 2) there had been multiple breaches of the Len Small Levee, which had resulted in damage to property located on Dogtooth Bend Peninsula; and 3) the area had long been subject to flooding of the same or a similar magnitude and duration. In addition, the government argues that Plaintiffs knew or should have known about their theory that the river training structures were responsible for the increase in water surface elevations before August 3, 2012.

The Court agrees with the government that Plaintiffs have failed to produce sufficient evidence—indeed any evidence—to show that their claims accrued after August 3, 2012. Thus, it is undisputed that the Dogtooth Bend area in which Plaintiffs' properties are located has been subject to frequent flooding since the nineteenth century. It is also undisputed that—even leaving aside the numerous flood events that occurred during the early and mid-twentieth century—the area was subjected to severe flooding more recently in 1973, 1993, 1994, 2008, and 2011 as a result of breaches or failures of the levee.

Further, the evidence shows that Plaintiffs knew or should have known before 2012 that the levee afforded only limited protection against the inundation of their properties by floodwaters. For one thing, as noted above, the levee had been periodically breached. For another, the levee provided no protection at all against backwater flooding, and, as explained in a 1984 Corps report, was not high enough to hold off the rise of floodwaters that would occur during even five- and ten-year flood events. See Def.'s Mot. Ex. 8, Ex. K at 59, 68.

Further, as shown above in Figure 1, many of Plaintiffs' properties are located in the vicinity of the town of Olive Branch, Illinois. The government has introduced evidence showing that—after the flood of 2011, and because of concerns about recurrent flooding—consideration

was given to offering residents whose property was in the floodplain a buyout and relocating them to higher ground. Three of the plaintiffs in this case signed up to receive that relief. This provides further evidence that Plaintiffs knew or should have known at least by the time of the 2011 flood that—irrespective of whether the levee was repaired—it would not prevent future catastrophic flooding from taking place. Indeed, such flooding did occur only five years later, in 2016.

Plaintiffs contend that until 2016, their property was not subject to flooding on a sufficiently frequent basis to support a permanent-taking claim. Although they do not deny the frequency of the backwater flooding of the area, they point out that the major floods of 1973, 1993–1994, and 2011 occurred decades apart.

To be sure, both the Federal Circuit and its predecessor court have observed that "[i]solated invasions, such as one or two floodings . . . do not make a taking." Eyherabide v. United States, 345 F.2d 565, 569 (Ct. Cl. 1965); see also Ridge Line, Inc. v. United States, 346 F.3d 1346, 1357 (Fed. Cir. 2003); Barnes v. United States, 538 F.2d at 870. But as Judge Allegra observed in Quebedeaux v. United States, "[o]n closer examination, the flooding cases seem to focus on periodicity only as one indication as to whether defendant has appropriated an interest for itself in the affected property." 112 Fed. Cl. 317, 323 (2013). "While a single flooding may indicate that such an interest has not been taken, that conclusion depends upon whether the flooding was truly an '[i]solated invasion,' Eyherabide, 345 F.2d at 569, as opposed to an event that characterizes a 'permanent liability to intermittent but inevitably recurring overflows.'" Id. (quoting Cress, 243 U.S. at 328). In the latter case, "it is conceivable that [the government's] actions may be viewed not as an 'isolated invasion,' but rather as reserving a flowage easement over the affected property." Id.

Judge Allegra's reasoning is applicable to Plaintiffs' claims. Certainly by the time of the 2011 flood, it was obvious that the area was liable to "intermittent but inevitably recurring overflows" (or breaches) of the levee, and that the breaches that had occurred were not isolated events. See Cress, 243 U.S. at 328. Indeed, the very premise of Plaintiffs' theory of causation is that the Corps' use of river training structures has caused and will continue to cause recurrent flooding of their land.

In addition, the Court finds that Plaintiffs knew or should have known before August 3, 2012: 1) that the Corps had by then placed hundreds of river training structures in the MMR; and 2) that—assuming the validity of Plaintiffs' theory—those structures were the cause of the floods that had breached or overtopped the levee in previous years. Indeed, in their original complaint, Plaintiffs attributed the breaches of the levee in 1993 and 2011 to the Corps' use of river training structures. Compl. ¶¶ 175, 178. While they have not included those allegations in their amended complaint, they also have not disavowed them. Nor have they, in response to the government's motion, provided any evidence to show that the effect of the river training structures on water levels did not cause the flood events that occurred before 2016—i.e., in 1993, 1994, 2008, and 2012.

In their opposition brief, Plaintiffs assert that since the 1990s, "the Government has introduced new types of structures that contribute more substantially to flooding than earlier varieties." Pls.' Resp. at 14 (citing Am. Compl. ¶¶ 90, 93–94). They also assert that "the full

impact of a river training structure is not immediately realized, but increases over time, as sediment gradually accumulates on or around the structures." Id. at 15 (citing Am. Compl. ¶¶ 130–31). In their brief they speculate that "river structures built at the end of the last century may only now be reaching the point of meaningful impact." Id. This last assertion is not supported by any evidence. Moreover, the Court does not understand Plaintiffs to be arguing that it was only after 2016 that the number and variety of river training structures in the MMR reached sufficiently critical mass to cause atypical flooding in the Dogtooth Bend area. Instead, they argue that before 2016 they could not have known that the prior floods caused by the structures had resulted in a permanent taking because they had been able to rebuild the levee each time with federal assistance. The permanent taking occurred, they argue, when the federal government did not provide financial assistance and they were left vulnerable to the more frequent and severe flooding that they allege has since occurred without the levee's protection.

In fact, the theory that river training structures caused water levels to rise on the MMR has been the subject of academic discussion since the mid-1970s. Moreover, there was local and national news coverage both before and shortly after the major flood event in 2011 concerning the contribution of river training structures in the MMR to the flooding that had occurred in 1993, 2008, and 2011. The theory also surfaced in congressional testimony and was discussed in a GAO report that was issued in December 2011. Because information about the effect of river training structures on water levels was easily available to Plaintiffs through public sources before August 3, 2012, they cannot assert ignorance of their claim prior to that date. See Yankton Cty. v. United States, 135 Fed. Cl. 620, 630 (2017) ("'A party will be charged with knowing any facts that are discoverable in public records, and ignorance of one's legal rights arising from those facts is not a sufficient excuse to justify' suspending the accrual of a claim.") (quoting Cent. Pines Land Co. v. United States, 61 Fed. Cl. 527, 534 (2004)).

In short, Plaintiffs have failed to produce any evidence in response to the government's motion to dismiss which shows that before August 3, 2012 they neither knew nor should have known: 1) that their properties had been and would continue to be subject to recurrent flooding; and 2) that the flooding could be attributed to the cumulative effect of the Corps' practice of using river training structures in the MMR. As such, Plaintiffs' cause of action for a permanent taking of their property by flooding accrued before August 3, 2012.

## III.    The Stabilization Doctrine

Notwithstanding the foregoing, Plaintiffs attempt to avoid the bar of the statute of limitations through invocation of the so-called "stabilization" doctrine. But their reliance on that doctrine is unavailing because their claims for a permanent taking clearly stabilized before August 3, 2012, even if—as a result of the federal government's refusal to provide federal assistance to rebuild the levee in 2016—their land then became subject to flooding that was more frequent and that caused greater interference with Plaintiffs' ability to put the land to agricultural and other use.

The stabilization doctrine has its genesis in United States v. Dickinson, 331 U.S. 745 (1947), and has since been refined and applied by the Federal Circuit and this court in numerous contexts. In Dickinson, "the Supreme Court grappled with th[e] problem" of determining the "exact moment of accrual" of a permanent-taking claim in cases where property has been taken

by a gradual physical process. Boling, 220 F.3d at 1370. The plaintiff in Dickinson had alleged that his land was permanently taken as a result of flooding caused by the federal government's construction of a dam. 331 U.S. at 746–47. After the dam was built, the Corps raised the river pool level in successive stages through the impoundment of water. Id. at 746. The Court rejected the government's argument that the plaintiff's takings claim accrued either when the dam began impounding water or later when the water was raised above its previous level and his land was partially submerged for the first time. It reasoned that "the source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous." Id. at 749. "[T]he frequency and permanency of the flooding was uncertain" at the time of the first inundation of the property. Boling, 220 F.3d at 1370. "Rather than requiring the plaintiff to sue in the face of such uncertainty," the Supreme Court held that accrual of the claim would be delayed "until the situation had 'stabilized' such that the 'consequences of the inundation have so manifested themselves that a final account may be struck.'" Id. (quoting Dickinson, 331 U.S. at 749).

As the Supreme Court later explained, Dickinson stands for the proposition that "the statute of limitations d[oes] not bar an action under the Tucker Act for a taking by flooding when it [is] uncertain at what stage in the flooding operation the land had become appropriated for public use." United States v. Dow, 357 U.S. 17, 27 (1958). Stabilization thus occurs "when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." Boling, 220 F.3d at 1370–71; see also Mildenberger v. United States, 643 F.3d 938, 946 (Fed. Cir. 2011) (Plaintiffs may not postpone suit until after "the damages are complete and fully calculable.").

According to Plaintiffs, their takings claims did not stabilize until after the levee was breached in 2016. They allege that "[t]hroughout the twentieth century, with the protection of the levee, farmers and landowners in southwestern Alexander County were not significantly impacted by changes affecting the river, whatever their cause." Am. Compl. ¶ 151. "Even when high water levels damaged the Levee," Plaintiffs allege, "property owners were able to repair it with the assistance of the federal government, which limited flooding to isolated and finite events." Id. ¶ 152. They contend that "the permanent exposure of Plaintiffs' lands to recurrent flooding became a reality only when the government walked away from contributing to the repair of the Levee after the Levee's 2016 breach." Pls.' Resp. at 9. They state that since 2016, they have for the first time become "vulnerable to the increasingly damaging atypical flooding events brought on by the Corps' construction of Structures in the River that had gradually become the norm while Plaintiffs had enjoyed the Levee's protection." Am. Compl. ¶ 164.

Plaintiffs' arguments lack merit. "[W]hile Dickinson and its progeny recognize that takings by gradual processes present special difficulties, these cases represent an application of general accrual principles, rather than a broad exception to them." Boling, 220 F.3d at 1371. Here, the record shows, as described above, that recurrent flooding had been "a reality" for decades in the Dogtooth Bend area before the 2016 event. To be sure, Plaintiffs have alleged—and the government does not deny—that flooding has occurred more frequently since the 2016 breach and has therefore caused even more substantial damage. But "the proper focus in a claim accrual analysis 'is upon the time of the [defendant's] acts, not upon the time at which the consequences of the acts become most painful.'" Boling, 220 F.3d at 1371 (quoting Del. State

Coll. v. Ricks, 449 U.S. 250, 258 (1980)). "[I]t is the uncertainty surrounding the permanent nature of the taking, not the uncertainty surrounding the ultimate extent of the [] damage, that is critical in determining whether the situation has stabilized." Id. at 1372; see also Whiteland Holdings, L.P. v. United States, 141 Fed. Cl. 702, 711 (2019), reconsideration denied, No. 18-1081L, 2019 WL 2158874 (Fed. Cl. May 17, 2019) (While plaintiffs may wait to sue until the "nature and extent of the taking" are clear, the "'nature and extent of the taking' refers to the taking's permanency (or lack thereof), not the taking's damages quantum.").

Further, there is no merit to Plaintiffs' argument that they did not have a claim for a taking until the federal government decided not to provide financial assistance to repair the levee because their damages before then "were not yet quantifiable and present." Pls.' Resp. at 12 (quoting Nw. La. Fish & Game Preserve Comm'n, 446 F.3d 1285, 1291 (Fed. Cir. 2006)). In Northwest Louisiana Fish & Game, the court of appeals stated that damages must be "quantifiable and present" in light of the principle that a permanent-taking claim cannot accrue until there has been damage to a plaintiff's property interests. 446 F.3d at 1291. The language does not undermine the principle set forth in Mildenberger and related cases that the stabilization doctrine does not allow plaintiffs to postpone suit until "the damages are complete and fully calculable." 643 F.3d at 946.[6]

Northwest Louisiana Fish & Game is inapposite because Plaintiffs here suffered damage before August 3, 2012; for example, when the levee was breached or overtopped in 2011, 2008, 1993, and several earlier years. Such damage was "quantifiable and present" by 2011 at the latest. Indeed, the Court finds it noteworthy that Plaintiffs could have brought precisely the same takings claims they pursue here after the 2011 levee breach, if not earlier. Instead, they chose again to seek federal assistance to rebuild the levee, as they had in the past. Had they instead brought suit before August 3, 2012, they presumably could have requested an award of damages that would have compensated them for the devaluation of their property caused by the ongoing risk of recurrent flooding, including the risk that the levee might be breached and not rebuilt.

---

[6] In Northwest Louisiana Fish & Game, the plaintiff, a state authority responsible for maintaining a nature preserve, alleged that certain actions taken by the Corps prevented it from continuing to periodically draw down the lake in the preserve to control the overgrowth of hydrilla (an aquatic weed). 446 F.3d at 1287–88. The government argued that the plaintiff's claim accrued in 1994 when it learned that the Corps would not allow it to draw down the lake. Id. at 1289. The court rejected that argument, relying on the well-established principle that a takings claim does not accrue until a plaintiff has suffered damage. Id. at 1291. The damage at issue in Northwest Louisiana Fish & Game was the "uncontrolled overgrowth" of hydrilla and that did not occur until several years after the Corps' refusal to reduce the water level. Id. "A possible future taking of property cannot give rise to a present action for damages," the court observed. Id. And until the hydrilla had grown to harmful levels and the Corps refused to drain the lake to alleviate the harm, the court held, "damages were not 'present,' i.e. they were still unquantifiable and speculative." Id.

Finally, the Court is not persuaded by Plaintiffs' arguments that the "generic data" that the government has offered in support of its motion to dismiss is irrelevant because "claim accrual under the stabilization doctrine is a fact-intensive parcel-specific inquiry." Pls.' Resp. at 2. In response to the government's motion to dismiss, it is Plaintiffs who must produce evidence to show that their claims did not accrue before August 3, 2012. See Reynolds, 846 F.2d at 748 ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question it [is] incumbent upon [plaintiffs] to come forward with evidence establishing the court's jurisdiction."). Notwithstanding this obligation, Plaintiffs have not provided the Court with any parcel-specific information that would suggest that the government's "generic" evidence concerning the frequency and nature of the flooding that occurred in the Dogtooth Bend area did not accurately convey what was happening on each of their properties.

In fact, Plaintiffs have submitted declarations from only two of the sixty-two plaintiffs who have joined this lawsuit—David Willis and Kenneth Sean Pecord. And the declarations do not show that those two plaintiffs' properties were not subject to recurrent flooding before August 3, 2012. To the contrary, both seem to acknowledge that their properties were affected, although they characterize the damage suffered as "isolated" or "limited" because on previous occasions the levee was ultimately rebuilt. Willis Decl. ¶ 8; Decl. of Kenneth Sean Pecord ("Pecord Decl."), Pls.' Resp. Ex. 3 ¶ 7, ECF No. 22-3. And Mr. Pecord, for one, apparently understood in the wake of the 2011 flood that he faced recurrent flooding going forward; for that reason he sought to participate in the FEMA buyout program. See Def.'s Mot. at 20–21 & n.20 (citing Am. Compl. Ex. 1, at 9; Def.'s Mot. Ex. 7, at 5–7).

The declarations also show that both plaintiffs decided that they could not continue to make a profit farming after 2016 because, without the levee in place, floods would occur more frequently and have more lasting consequences. Willis Decl. ¶¶ 13–15; Pecord Decl. ¶¶ 9–13. But for the reasons set forth above, their realization that their land would be flooded more frequently going forward is not inconsistent with a conclusion that they knew or should have known that their property had already been permanently taken years earlier.

\*                    \*                    \*

In sum, the Court finds based on the evidence before it that Plaintiffs' takings claims accrued before August 3, 2012 because they knew or should have known by that date that their property was subject to inevitably recurrent flooding. To the extent that there is an overall lack of parcel-specific evidence in the record concerning past flood-related damage, the burden is on Plaintiffs—not the government—to fill that void. For these reasons, Plaintiffs' claims are time-barred under the Tucker Act's six-year statute of limitations and must be dismissed.

## CONCLUSION

In accordance with the foregoing, the government's motion to dismiss (ECF No. 19) is **GRANTED** and this case is **DISMISSED without prejudice** for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1). The Clerk is directed to enter judgment accordingly. The parties shall bear their own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan         
ELAINE D. KAPLAN
Judge